IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

DEREK O. THOMAS,

        Plaintiff,

    Vs.                       No.  11-4040-SAC

UNIFIED SCHOOL DISTRICT #501,

        Defendant.

MEMORANDUM AND ORDER

After nearly twelve years of employment as a school custodian with Unified School District #501 ("#501"), the plaintiff Derek O. Thomas ("Thomas") was the subject of complaints and an investigation that resulted in a letter of termination and the # 501 Board of Education's approval of the termination.  The letter laid out these grounds for termination: "[i]nappropriate involvement with a student," "[f]alsifying a district report," and [s]exual harassment."  (Dk. 28-22, p. 1).  Relying on Title VII and 42 U.S.C. § 1981, Thomas claims he was unlawfully terminated due to his race or gender and/or in retaliation for complaining of unlawful discrimination. Thomas further claims disparate treatment in terms and conditions in violation of § 1981.  Unable to show that #501's nondiscriminatory reasons for its treatment and termination of him are pretextual, Thomas's claims are subject to summary judgment.

**SUMMARY JUDGMENT STANDARDS**

Rule 56 authorizes judgment without trial "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law governs the elements of a given claim or defense and reveals what issues are to be determined and what facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one which would affect the outcome of the claim or defense under the governing law. *Id*.

The movant has the initial burden of showing from the record that the movant is entitled to judgment as a matter of law. *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992). Instead of disproving a claim or defense, it's enough for the movant to show "a lack of evidence" on an essential element. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). If this burden is met, the non-movant must come forward with specific facts based on admissible evidence from which a rational fact finder could find in the non-movant's favor. *Id*. The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004). The essential inquiry is "whether the evidence presents a sufficient

disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. at 251-52.  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587; *see Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

In ruling on a motion for summary judgment, the nonmoving party's admissible evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Anderson*, 477 U.S. at 255.  Facts and reasonable inferences therefrom are to be viewed in the light most favorable to the nonmoving party. *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005).  At this stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." *Anderson*, 477 U.S. at 255.

**STATEMENT OF FACT**

An African-American male, the plaintiff Derek Thomas was 54-years old during the time in question.  He worked for the defendant #501 from 1997 to 2009 and was on administrative leave from the position of

3

school custodian/building operator[1] at Lowman Hill Elementary School ("Lowman Hill") when terminated on February 2, 2009.

In March of 2008, a parent complained that her son, a student at Lowman Hill, was claiming that Thomas stuck his hand down the student's shirt and that he pulled on the student's ear. Carla Nolan, Personnel Director for #501, had the complaint investigated and interviews conducted with the teacher, Rebecca Fielder, and the students all of whom were at the incident. Thomas was cleared of any wrongdoing, as the interviews showed he had done nothing inappropriate. As a measure to protect #501 and Thomas, Lowman Hill's principal, Russ Hutchins, sent a memo to Thomas instructing against touching any Lowman Hill student. A copy of the memo was kept in Thomas's employment file.

Nine months later, on December 8, 2008, following complaints from staff and parents, Principal Hutchins warned Thomas in writing, "that any display of affection toward Ms. Rebecca Fiedler at the school is prohibited" and that "[t]here is to be no display of affection on the school grounds at anytime." (Dk. 28-7). Thomas signed this warning memo.

A night custodian submitted a letter of resignation on January 6, 2009, explaining his concerns and reasons for his decision. Among them

---

[1]Because the plaintiff stipulated to this fact in the pretrial order, (dk. 25, p. 2), he is unable to controvert it now by asserting he was the "head" building operator.

4

was a complaint of "inappropriate physical contact" between the day custodian and a third-grade teacher.  (Dk. 28-10).  He described having walked into the custodians' office, the lunchroom kitchen and the third-grade classroom after hours to find Thomas and Fiedler kissing.

On the afternoon of January 13, 2009, Thomas was working at Lowman Hill while an after-school dance club led by Angelique Best was meeting.  Angelique's mother, Mary Best, is a special education paraprofessional at Lowman Hill.  The next morning, January 14, 2009, Angelique and Mary Best told Principal Hutchins about an incident on January 13 involving Thomas and a fourth grade student, EBB, who participated in the dance club.  Later that morning, EBB's mother came to school and reported her daughter's story about Thomas.

On January 14, 2009, Principal Hutchins took the following statements regarding this incident.  Angelique Best gave a statement that on January 13 she saw Thomas walking with EBB into the kitchen and from the kitchen door she later saw Thomas with his arms around EBB standing close to her.  Angelique also said she gave EBB a ride home that night and EBB had told her Thomas had tried to kiss her.  Mary Best also gave a statement that she saw Thomas standing in the unlit kitchen with his hands or arms around EBB's shoulders.  EBB was interviewed and said that Thomas had asked her to get a trash bag from the kitchen.  When EBB told Thomas that she did not know where the bags were stored, Thomas told EBB to follow

5

him and he would show her. While in the unlit kitchen, EBB said that Thomas tried to kiss her but she pulled away.  According to a statement from EBB's mother, EBB told her that Thomas tried to hug EBB in the kitchen.[2]

With these complaints and/or statements in hand, Principal Hutchins and Personnel Director Nolan met with the plaintiff about this matter.  They told him that a student involved in an after-school dance class had reported that Thomas had tried to kiss her on January 13.  Thomas denied having any interaction with students after the dance class.  Then asked if he had encountered any students in the kitchen, Thomas said there were no students in the kitchen.  When questioned about whether he asked

---

[2]Plaintiff denies the incident occurred as related in these statements and summarized in this paragraph.  While this may create a genuine issue of material fact over whether the incident so happened, it does not controvert that the witnesses made these statements to #501 personnel.  The plaintiff may even concede that such "report[s] took place."  (Dk. 37, p. 4, ¶ 18).  The court also cautions the plaintiff's counsel about offering incomplete and isolated citations of the minor's testimony at the SRS hearing and then mischaracterizing that testimony as "nothing happened in the kitchen."  (Dk. 37, p. 4, ¶ 17).  It's true that at page 28 of the transcript, the minor in answering the question, "Did you go back to the kitchen?", said "No.  I went in there, and I tried to go look for them, and then he followed me in there, and then that was it, and . . ."  On the very next page of the transcript, the minor testified as follows:

    Q.  Okay.  And do you remember being in the kitchen with Mr. Thomas?
    A.  Yes.  Yes.
    Q.  Okay.  EBB, did Mr. Thomas touch you?
    A.  Yes.
    Q.  And did he do anything else while he was in there?
    A.  He--he tried to kiss me.
(Dk. 37-3, pp. 8-9).

a student to get a trash bag from the kitchen, Thomas said he had done this but that he could not remember the student's name.  Thomas denied attempting to kiss a student but admitted that students did try to kiss him and that he discouraged this.[3]  Thomas then was put on administrative leave pending further investigation into these allegations.

On January 20, the Personnel Director Nolan met with Thomas who provided her with his written statement dated January 15.  Thomas explained to Nolan that his blood pressure was elevated on January 14 and after further reflection he could now better recall what happened on January 13.  Thomas wrote that he had asked at least two students to get him a trash liner but they could not find one.  So, Thomas went into the kitchen and saw EBB taking snacks from the cabinet.  Thomas included in his written statement that when he left, the after-school program teacher, Dolly, hugged him and he kissed her on the cheek.  Based on the letter and from statements made at their meeting on January 20, Director Nolan understood that Thomas was saying he had accompanied the other students to the kitchen and they saw EBB taking the chips.  Nolan also understood Thomas

---

[3]None of these statements are effectively controverted by what the plaintiff cites from Nolan's testimony in the SRS hearing.  In that cited testimony, Nolan concedes that her reports did not record "exactly" what Thomas had been asked or what his response was and that it was "possible" Thomas may have misunderstood what he had been asked.  (Dk. 37-3, p. 36).  Notably, the plaintiff does not cite any testimony or evidence from him that Nolan's reports of this meeting were inaccurate or that he did not understand Nolan's questions during that meeting.

to assert that Dolly Lewis was present at the time of the alleged incident and would verify that he had not touched EBB.

Two of the students identified in Thomas's statement were interviewed, and both told Principal Hutchins that they were not in the kitchen with Thomas and they did not see EBB taking snacks.  Director Nolan had interviewed Dolly Lewis on January 14, and Lewis had said she did not see or hear any interactions between Thomas and EBB on January 13, as she was working with her students.  Director Nolan's investigation included interviewing a number of teachers who were concerned about Thomas's interaction with students and a number of female teachers complained of unwanted physical contact from Thomas.  During the investigation, another student, CM, asserted that Thomas had asked her to dance and to kiss him but that she did not feel comfortable doing either.[4]

Two weeks after the complaints were made, on January 28, 2009, Director Nolan met again with Thomas to review allegations and to give Thomas a chance to respond to them.  Thomas repeated his position that he was in the kitchen with three students when he saw EBB stealing chips.  When told the students did not confirm his statement, Thomas said

---

[4]The plaintiff objects as hearsay to Nolan's averments regarding statements made by other teachers and the student CM.  The court overrules this objection, as the defendant is not offering these statements to prove that the plaintiff committed these acts but to show the defendant's state of mind and knowledge following its investigation.

they were in the kitchen when he confronted EBB and when EBB stuck out her tongue at him.  Director Nolan asked other questions of Thomas before telling him she had completed the investigation.  She then explained the results would be reviewed with her advisors and later shared with Thomas.

By letter dated February 2, 2009, Director Nolan notified Thomas of his proposed termination for the following reasons:  "[i]nappropriate involvement with a student," "[f]alsifying a district report," and "[s]exual [h]arassment."  (Dk. 28-22).  All three reasons are among those listed in #501's written employment policies as disciplinary grounds for "reprimand, suspension, disciplinary supervision or dismissal."  (Dk. 28-23, pp. 1-2). Thomas admits to reading these policies and to knowing termination could result from these offenses.

In his deposition, Thomas generally admitted that it would be reasonable and appropriate for a person investigating the allegations against him to consider the statements given by EBB, Mary Best, Angelina Best, and CM.  He further admitted that portions of his first statement about this incident given to Director Nolan and Principal Hutchins were inconsistent with his later statements.  There is no record in the defendant's possession showing the plaintiff ever complained of race or sex discrimination.  Thomas argues his protected complaint arose in response to Principal Hutchins' instruction in December of 2008 that Thomas should stop all public display of affection toward the teacher, Ms. Fielder, on school grounds.  According to

Thomas's brief, he made a gender complaint at that time to Hutchins by pointing out he was being reprimanded, but not Ms. Fiedler who was making the advances on him.  (Dk. 37-2 p. 10, Thomas Dep. p. 341).

Thomas appealed a finding by the Kansas Department of Social and Rehabilitation Services ("SRS") that he had sexually abused EBB on January 13, 2009.  The presiding officer conducted an administrative hearing on April 9, 2010, hearing the testimony of sixteen witnesses.  On May 5, 2010, the presiding officer filed his findings of fact and conclusions of law. He affirmed the agency's finding that Thomas had "sexually abused EBB" and added Thomas "to the Central Registry."  (Dk. 28-25, p. 7).

Thomas offers his own statement of facts that include several assertions made during his deposition, such as, that he was the subject of these complaints and allegations because of his race and that white females employed at Lowman Hill hugged and kissed students without being disciplined.  Thomas also points out some discrepancies between statements taken near the time of the incident and the sworn testimony given over a year later in the SRS hearing.  The court will discuss these proposed facts and others later in the order.

**GENDER AND RACIAL DISCRIMINATION**

The plaintiff first asserts race and gender discrimination in the terms and conditions of employment and in his termination.  For purposes of this motion, the parties impliedly agree that the plaintiff relies exclusively on

10

circumstantial evidence, that the plaintiff's claims are to be analyzed under the burden-shifting framework of in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), and that the plaintiff can meet the elements of a prima facie case of gender and racial discrimination.  Thus, the burden now shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for the adverse employment action."  *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).  The uncontroverted facts are that #501 put Thomas on administrative leave as it investigated complaints that he had inappropriate involvement with a student, EBB, on January 13, 2009. Following the two-week investigation, #501 terminated Thomas and provided a written statement of reasons that included:  inappropriate involvement with this student, giving false reports during this investigation, and sexual harassment of female staff members.  The defendant has articulated a legitimate, nondiscriminatory explanation for the adverse employment actions taken against Thomas.

Once the defendant puts forward such reasons, "the presumption of discrimination created by the plaintiff's prima facie case 'simply drops out of the picture,'" *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)), and the burden shifts back to the plaintiff to show the defendant's proffered reasons are a "'pretext masking discriminatory animus.'"  *Proctor v. United Parcel* Service, 502 F.3d

1200, 1208 (10th Cir. 2007) (quoting *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007)).  The plaintiff "must point to some admissible evidence showing that the . . . [the defendant's] proffered explanation is mere pretext." *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199, 1211 (10th Cir. 2011).  "[A] pretext argument provides a method of satisfying this burden by allowing the factfinder 'to infer the ultimate fact of discrimination from the falsity of the employer's explanation.'" *Swackhammer*, 493 F.3d at 1167 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)).  A plaintiff can show pretext with evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006) (citations and internal quotation marks omitted).  "Evidence of pretext may include prior treatment of the plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria." *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005) (citations and internal quotation marks omitted).  "Demonstrating pretext enables a plaintiff to survive summary judgment." *Timmerman*, 483 F.3d at

1113.

"One typical method for a plaintiff to prove pretext is by providing direct 'evidence that the defendant's stated reason for the adverse employment action was false.'"  *Swackhammer*, 493 F.3d at 1167 (quoting *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).  This "challenge of pretext requires" a court "to look at the facts as they appear to the person making the decision to terminate plaintiff." *Kendrick*, 220 F.3d at 1231.  The plaintiff must present evidence of a genuine factual dispute "concerning the sincerity of the defendants' proffered reason(s)" for the adverse employment actions when taken.  *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998).   "The test is good faith belief," and an employer's reason does not become pretextual "merely because with the benefit of hindsight, it turned out to be poor business judgment." *Id.* (citing *Reynolds v. School District No. 1 Denver*, 69 F.3d 1523, 1535 (10th Cir. 1995))   Thus, if the defendant employer investigates allegations of the plaintiff's misconduct and believes the allegations to be true, then "such belief would not be pretextual even if the belief was later found to be erroneous" or the allegations were later found to be false.  *Id.*; *see Kendrick*, 220 F.3d at 1231.  "'[A] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual.'"  *Kendrick*, 220 F.3d at 1231 (quoting *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1322 n. 12 (10th Cir. 1992)).

In arguing pretext, the plaintiff first challenges the defendant's reasons as false.  The plaintiff points to inconsistencies in the stories given about January 13 incident by Mary Best, Angelique Best and EBB.  The plaintiff's evidence of inconsistencies rests on their testimony at the SRS hearing held over a year after the incident.  Such testimony and the argued inconsistencies did not exist in January and February of 2009 when the investigation occurred.  This evidence did not exist when Thomas was put on administrative leave and later terminated.  Thus, it does not tend to show that #501 lacked a good faith belief in its investigation results.  Nor does the plaintiff fashion any reasonable argument for #501 anticipating or suspecting these witnesses would give inconsistent accounts.

The plaintiff next challenges #501's investigation as less than fair and complete because interviews of the principal's secretary and others were not conducted, because it did not consider the atmosphere at Lowman Hill that allowed hugging students, because it did not consider the plaintiff's disciplinary record, and because it did not vindicate the plaintiff's conduct. The plaintiff fails to argue and explain what additional information and knowledge possessed by the principal's secretary, Ms. Clothier and Ms. Lewis, would have influenced the investigation.  Ms. Clothier was not present at the incident, while Ms. Lewis was interviewed and said she was busy and did not witness any interaction between Thomas and EBB.

The plaintiff offers no evidence showing deficiencies with the

14

investigation.   Instead, Director Nolan's report prepared from the investigation shows the plaintiff's employment and disciplinary histories were reviewed and considered and that a number of Lowman Hill staff members were interviewed about Thomas's interaction with students and other staff within the context of the school's atmosphere.  (Dk. 28-9).  As for the results of the investigation, the plaintiff comes forward with no evidence tending to show a lack of good faith or procedural irregularities.  It is noteworthy that Director Nolan also did the investigation in March 2008 that absolved Thomas of a complaint for inappropriate touching of a student. That the plaintiff disagrees with the results of the second investigation on a separate incident in January 2009 is not evidence of pretext.  The plaintiff does not show anything about the length, scope or results of the investigation as indicative of pretext, and his allegations on the motives behind it are "mere conjecture[s]" that will not defeat summary judgment. *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011) (internal quotation marks and citation omitted).  The plaintiff has not created any genuine factual issue of pretext over the defendant's good faith belief in the results of a reasonably fair investigation.

Relying on his deposition testimony, the plaintiff says he has identified two white male employees of #501 "who committed sexually related offenses" and were not terminated.  (Dk. 37, p. 23).  The plaintiff testified about both situations without establishing his personal knowledge

15

about either of them.  The court sustains the defendant's hearsay objections to the plaintiff's testimony on these matters that is being offered to prove the truth of what is asserted in them.  Even if this evidence had been admissible or if the plaintiff's conclusory testimony is credited that white females at Lowman Hill do hug and kiss students, this does not qualify as "evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Timmerman*, 483 F.3d at 1120 (internal quotation marks and citation omitted).  None of these incidents is comparable to what the defendant learned in its investigation and then disciplined the plaintiff for.  Despite a prior written warning not to touch students, the defendant had been seen by more than one witness attempting to kiss or hug a female student against her will in an unlit room, that the plaintiff then submitted a false report of the incident, and that the plaintiff had sexually harassed female staff members.  The plaintiff's arguments fall far short of evidence of comparable work rule violations or of disparate treatment of him under written or unwritten policies.

As for the defendant's articulated reason that its investigation showed the plaintiff had falsified school records, the plaintiff argues pretext in that Director Nolan admitted her notes were not verbatim accounts of the plaintiff's statements and in that she also acknowledged the possibility of the plaintiff not understanding her questions.  This speculation does not create

16

any reasonable inference that Director Nolan may have knowingly recorded the plaintiff's responses inaccurately or that she may have known the plaintiff was confused or did not understand her questions and so based her finding of "false reports" on this.  Thomas even admitted in his deposition that there were inconsistencies between his first statement about the incident and his later statements.

        Thomas also offers that these inconsistencies were related to his health problems and fatigue on January 14.  There is no evidence, however, that during the relevant time period, Director Nolan was presented with reasonable grounds for believing that Thomas suffered from serious health or fatigue issues that could explain the significant inconsistencies in his statements.  (Dk. 37-3, p. 38).   As reflected in Nolan's report, Thomas on January 14 had told her that he "did not have any interactions with students after the dance class," on January 13, that there were no students in the kitchen, and that he had asked a student to get him a trash bag but could not remember the student's name.  (Dks. 28-3, pp. 3-4; 28-9, p. 4).  On January 20, Thomas gave Nolan another statement about the incident on January 13 saying his blood pressure was high on January 14 and with rest he was better able to remember what happened.  *Id.*  This time Thomas told Nolan that he and two students did go to the kitchen on January 13 for trash bags and found EBB, a dance class student, taking snacks.  When Thomas

17

confronted her, EBB acted disrespectfully toward him.[5]  The court is unable

to infer a reasonable argument for pretext from these circumstances.

Director Nolan certainly acted within her discretion in discounting Thomas's

health excuse as an explanation for Thomas first denying that he was in the

kitchen with any students or that he had any contact with dance students

and then less than a week later offering that he was in the kitchen with

three students and that he had some unpleasant interaction with a dance

student.  The plaintiff has not created any genuine issue of fact over pretext

regarding the defendant's termination of him for falsifying records.

         The last of the defendant's articulated reasons is that Thomas

had sexually harassed female staff.  The plaintiff challenges it as pretext

because the defendant has given conflicting accounts on the number of

complaining female staff members and because his performance reviews

make no mention of complaints or problems amounting to sexual

harassment.  Additionally, the plaintiff simply denies having any physical

contact with female staff that was not consensual and appropriate.  None of

the plaintiff's challenges present any reason for questioning the good faith

belief of Director Nolan and #501 about sexual harassment.  Three female

staff members told Nolan of unwanted physical contact by Thomas, and

other female staff told her that Thomas makes them uncomfortable and that

---

         [5]Principal Hutchins interviewed both students who denied being in the
kitchen with Thomas and witnessing EBB take snacks.

they avoid being in a room alone with him.  (Dk. 28-9, pp. 7-8).  One staff member told Nolan that she was reluctant to speak as she feared retaliation by Thomas.  *Id.* at 8.  The defendant investigated the allegations against Thomas, conducted interviews, and relied on these results in taking the adverse employment actions.  Nothing argued by the plaintiff amounts to a showing from which a reasonable factfinder could rationally find the defendant's stated reason to be unworthy of credence.  The plaintiff fails to identify sufficient evidence requiring submission to a jury on his claims for racial and gender discrimination.

**RETALIATION**

"The 'opposition clause,' . . ., provides that an employer may not retaliate against an employee 'because he has opposed any practice made an unlawful employment practice' by Title VII.  *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1151 (10th Cir. 2008) (citing 42 U.S.C.A. § 2000e-3(a)), *cert. denied*, 129 S. Ct. 1528 (2009).  Relying on indirect or circumstantial evidence and not on direct evidence, the *McDonnell Douglas* framework applies to the plaintiff's retaliation claim.  *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199, 1210 (10th Cir. 2011). This framework imposes on the plaintiff the initial burden of establishing the following prima facie case of retaliation:  "(1) that he engaged in protected activity;  (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected

activity and the materially adverse action."  *Proctor v. United Parcel* Service,

502 F.3d at 1208.  Should the plaintiff come forward with this prima facie

case, the defendant employer must offer a nondiscriminatory reason for the

adverse action.  *Piercy v. Maketa*, 480 F.3d at 1198.  If the defendant

provides this legitimate reason for termination, then the burden shifts back

to the plaintiff to show the defendant's "reason is a "pretext masking

discriminatory animus.'"  *Piercy*, 480 F.3d at 1198.

          According to the plaintiff's memorandum opposing summary

judgment, what he claims as his protected activity is that when Principal

Hutchins warned Thomas against public display of affections toward Ms.

Fiedler, Thomas complained "about the apparent disparity in treatment

based on gender between him and Ms. Fiedler, a female, who was the one

making the advances."  (Dk. 37, p. 33).[6]  The plaintiff cites as evidence of

this protected activity his deposition testimony which consists of the

following:

> Q.  All I'm trying to get at is what you're talking about here.  My--I'm
> gathering from your look and your testimony you don't recall what
> went on in December of 2008?
> A.  No, I don't.  No.
> Q. Okay.
>      Mr. FLOREZ [Plaintiff's counsel]:  I do.
>      MR. BORK:  Okay.  Well, go ahead.
>      MR. FLOREZ:  Well, this is--in December of 2008 the principal
> Hutchins talked to you about allegations of displays of affection with

---

[6]The pretrial order fails to define what activity by the plaintiff is being
claimed as protected.

Rebecca Fiedler, a third grade teacher.  And as I understand it from a memo that he wrote, Mr. Hutchins the--you were asked to stop making or displaying affection towards and you complained that she's the one who was making advances towards you.

    THE WITNESS:  Right.

    MR. FLOREZ: And they weren't doing anything about it except accusing you of harassment when, in fact, it was being directed towards you.  Is that correct?

    THE WITNESS:  Yes, that's correct.

    MR. BORK:  Okay.

Q.  (BY MR. BORK) With your counsel's comment you believe that's what is referenced in your petition of paragraphs 9 and 10--I'm sorry, yeah, paragraph 10 regarding--

A.  Sexual harassment.

Q.  Well, yeah, it's in the context of reporting the sexual harassment.

A.  She didn't report no sexual harassment on me.

Q.  It says you.

    MR. FLOREZ:  You reported it.

    THE WITNESS:  Oh, yeah.

(Dk. 28-2, p. 25, Thomas Dep. pp. 340-41).  The other evidence cited by the plaintiff is Principal Hutchins's memo to him.  (Dk. 37, p. 33; Dk. 28-7, Ex. F).  The plaintiff cites no evidence to support his argument that he complained to Principal Hutchins about the disparate treatment of him based on gender.

    To be protected activity under Title VII, the plaintiff must be opposing a practice made an unlawful employment practice by Title VII. *Petersen v. Utah Dept. of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002). "Title VII does not prohibit all distasteful practices by employers." *Id.* "Although no magic words are required to qualify as protected opposition, the employee must convey to the employer his or her concern that the employer has engaged in [an unlawful] practice." *Hinds v. Sprint/United*

21

*Management Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)(citing *Anderson v. Academy School Dist., 20*, 122 Fed. Appx. 912, 916 (10th Cir. 2004) (unpublished opinion)).  "General complaints about company management and one's own negative performance evaluation will not suffice." *Hinds*, 523 F.3d at 1203.  "[A] vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim." *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x at 916 (citing *Petersen*, 301 F.3d at 1188).

As the defendant argues, the plaintiff has no evidence that his comments to Principal Hutchins constituted a complaint of gender discrimination as much as a general complaint that Ms. Fielder was more "culpable" as she was making the advances on him.  Principal Hutchins understood the plaintiff's complaint in this same way as shown by his memo dated April 20, 2009:

> When I asked Mr. Thomas to stop these actions he replied that Ms. Fiedler was making the advances toward him and she was showing the display of affection towards him.  He felt she was in the wrong.  I said I would speak to Ms. Fiedler to cease her actions while at school and on school grounds.

(Dk. 28-8).  The plaintiff's retaliation claim is subject to summary judgment for failure to establish the element of protected activity, that is, he complained or conveyed his concern that the employer had engaged in gender discrimination.  Even assuming the plaintiff could make out a prima

22

face case, summary judgment on this claim is necessary as the plaintiff is without sufficient proof of pretext for the reasons stated above.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk. 27) is granted.

Dated this 23rd day of May, 2012, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge